NOS. 22-4735(L); -4736

In The

# United States Court Of Appeals
## For The Fourth Circuit

**UNITED STATES OF AMERICA,**

*Plaintiff - Appellee,*

**v.**

**IZZAT FREITEKH; TARIK FREITEKH, a/k/a Tareq Freitekh,**

*Defendants - Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
AT CHARLOTTE

————————

## BRIEF OF APPELLANT
## IZZAT FREITEKH

————————

**W. Rob Heroy**
**GOODMAN, CARR, LAUGHRUN,**
  **LEVINE & GREENE PLLC**
**301 South McDowell Street**
**Suite 602**
**Charlotte, NC  28204**
**(704) 372-2770**

*Counsel for Appellant*
  *Izzat Freitekh*

**Mark A. Yurachek**
**MARK ALLEN YURACHEK**
  **& ASSOCIATES, LLC**
**1344 LaFrance Street, NE**
**Suite 3**
**Atlanta, GA  30308**
**(470) 319-8721**

*Counsel for Appellant*
  *Izzat Freitekh*

*Gibson*Moore Appellate Services, LLC
206 East Cary Street ♦ P.O. Box 1460 (23218) ♦ Richmond, VA 23219 804-249-7770 ♦ www.gibsonmoore.net

------- ◊ -------

## **TABLE OF CONTENTS**

**Page:**

TABLE OF AUTHORITIES..........................................iii

JURISDICTIONAL STATEMENT........................................1

STATEMENT OF ISSUES.............................................1

STATEMENT OF THE CASE...........................................1

STATEMENT OF FACTS..............................................2

    A.   The Paycheck Protection Program ("PPP")...............2

    B.   Izzat's Businesses...................................4

        1.   La Shish Kabob Restaurant ("LSK")...............4

        2.   Green Apple Catering ("GA")....................5

        3.   LSC............................................6

        4.   Aroma Packaging ("Aroma")......................6

    C.   The Investigation....................................7

SUMMARY OF THE ARGUMENT........................................13

ARGUMENT AND CITATION OF AUTHORITY............................14

    I.   THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN THE
       VERDICT..........................................14

        A.   False Statements..............................14

            1.   Use of Izzat's email.....................15

            2.   The Kyber envelopes......................17

        B.   Money Laundering..............................20

            1.   Actual subjective knowledge...............20

            2.   Conspiracy................................23

II.  LIMITING   IZZAT'S   CROSS-EXAMINATION   OF   A
     GOVERNMENT   WITNESS   VIOLATED   HIS   CONFRONTATION
     RIGHT....................................................24

     A.   Izzat Had A Right To Cross-Examination.........24

     B.   Harm...........................................31

III. ODOM'S   TESTIMONY   WAS   MORE   PREJUDICIAL   THAN
     PROBATIVE...............................................33

IV.  THE   COURT   ERRED   IN   APPLYING   MULTIPLE   SENTENCE
     ENHANCEMENTS............................................36

     A.   The Court Used Acquitted Conduct To Enhance
          Izzat's Offense Level...........................37

     B.   The Court Was Not Authorized To Interpret
          "Loss" To Mean "Intended Loss".................38

          1.   The   Guideline's   text   requires
               calculation of actual loss................39

          2.   The   court's   finding   of   intent   to
               launder all of the funds received has
               no support in the record..................43

     C.   The   Court   Erred   In   Enhancing   Izzat's
          Sentence Based On Gross Receipts...............45

CONCLUSION....................................................47

STATEMENT REGARDING ORAL ARGUMENT.............................47

CERTIFICATE OF COMPLIANCE.....................................49

------- ◊ -------

## TABLE OF AUTHORITIES

**Page(s):**

**UNITED STATES CONSTITUTION**

U.S. Const. Amend. V......................................28, 38

U.S. Const. Amend. VI.............................14, 24, 25, 38

U.S. Const. Amend. VIII....................................38

**FEDERAL APPELLATE DECISIONS**

*United States Supreme Court*

Auer v. Robbins,
     519 U.S. 452 (1997)...................................39, 41

Bowles v. Seminole Rock & Sand Co.,
     325 U.S. 410 (1945).............................39, 40, 41

Davis v. Alaska,
     415 U.S. 308 (1974)..........................24, 25, 26, 31

Douglas v. Alabama,
     380 U.S. 415 (1965)...................................25, 29

Jackson v. Virginia,
     443 U.S. 307 (1979)......................................14

Jones v. United States,
     574 U.S. 948 (2014)......................................38

Kisor v. Wilkie,
     139 S.Ct. 2400 (2019)........................39, 40, 41, 42

McClinton v. United States,
     600 U.S. ___, 143 S.Ct. 2400 (June 30, 2023)......37, 38, 44

Stinson v. United States,
     508 U.S. 45 (1993).............................39, 40, 41

United States v. Cabrales,
     524 U.S. 1 (1998)........................................44

iii

***Fourth Circuit***

Anderson v. Warden,
    696 F.2d 296 (*en banc*) (4th Cir. 1982)...............31, 32

Hoover v. State of Md.,
    714 F.2d 301 (4th Cir. 1983)..........................31, 33

In re Martin Marietta Corp.,
    856 F.2d 619 (4th Cir. 1988) <u>cert</u>. <u>denied</u>,
    490 U.S. 1011 (1989).....................................30

Kinder v. White,
    609 F. App'x 126 (4th Cir. 2015)........................24

McMellon v. United States,
    387 F.3d 329 (4th Cir. 2004)(*en banc*)...................42

United States v. Campbell,
    977 F.2d 854 (4th Cir. 1992).....................20, 23, 31

United States v. Campbell,
    22 F.4th 438 (4th Cir. 2022)....................41, 42, 43

United States v. Heaps,
    39 F.3d 479 (4th Cir. 1994).............................23

United States v. Limbaugh,
    2023 WL 119577 (4th Cir. Jan. 6, 2023)..................42

United States v. Moses,
    23 F.4th 347 (4th Cir. 2022).........................40, 41

United States v. Savage,
    885 F.3d 212 (4th Cir. 2018)............................38

United States v. Shivers,
    56 F.4th 320 (4th Cir. 2022)............................36

United States v. Simpson,
    910 F.2d 154 (4th Cir. 1990)............................33

United States v. Smith,
    451 F.3d 209 (4th Cir. 2006)....................24, 31, 33

***D.C. Circuit***

United States v. Winstead,
    890 F.3d 1082 (D.C. Cir. 2018)..........................42

iv

### Second Circuit

United States v. Cardillo,
    316 F.2d 606 (2d Cir. 1963)...............................29

United States v. Coven,
    662 F.2d 162 (2d Cir. 1981)...............................25

### Third Circuit

United States v. Banks,
    55 F.4th 246 (3d Cir. 2022)...........................40, 43

United States v. Henderson,
    64 F.4th 111 (3d Cir. March 29, 2023)....................39

United States v. Nasir,
    17 F.4th 459 (3d Cir. 2021)(*en banc*).....................41

### Fifth Circuit

United States v. Burton,
    126 F.3d 666 (5th Cir. 1997)..............................18

United States v. Cochran,
    546 F.2d 27 (5th Cir. 1977)...............................34

United States v. Sandlin,
    589 F.3d 749 (5th Cir. 2009).........................46, 47

### Sixth Circuit

United States v. Algee,
    599 F.3d 506 (6th Cir. 2010)..............................15

United States v. Riccardi,
    989 F.3d 476 (6th Cir. 2021)..............................41

### Seventh Circuit

U. S. ex rel. Blackwell v. Franzen,
    688 F.2d 496 (7th Cir. 1982)..............................25

United States v. Smith,
    454 F.3d 707 (7th Cir. 2006)..............................24

United States v. Williams,
    698 F.3d 374 (7th Cir. 2012)..............................36

### *Ninth Circuit*

United States v. Messer,
    197 F.3d 330 (9th Cir. 1999).........................20, 23

### *Eleventh Circuit*

United States v. Dupree,
    57 F.4th 1269 (11th Cir. Jan. 18, 2023)(*en banc*).......40-41

United States v. Lander,
    668 F.3d 1289 (11th Cir. 2012)..........................20

## FEDERAL DISTRICT COURT DECISIONS

F.T.C. v. Cambridge Exchange, Ltd., Inc.,
    845 F.Supp. 872 (S.D. Fla. 1993).......................30

United States v. Doyle,
    2018 WL 1902506 (S.D.N.Y. 2018)........................34

## FEDERAL BANKRUPTCY COURT DECISIONS

In re Springfield Hosp., Inc.,
    2020 WL 2125881 (Bankr. D.Vt. 2020)......................3

## FEDERAL STATUTES

18 U.S.C. §982...........................................46

18 U.S.C. §1001......................................14, 27

18 U.S.C. §1957.................................20, 23, 44

28 U.S.C. §1291...........................................1

## UNITED STATES SENTENCING GUIDELINES

U.S.S.G. §2B1.1.......................................passim

U.S.S.G. §4B1.2..........................................41

------- ◊ -------

## JURISDICTIONAL STATEMENT

The Fourth Circuit has jurisdiction over this matter pursuant to 28 U.S.C. §1291. It is an appeal of the rulings, verdict and sentence in a criminal case by the United States District Court for the Western District of North Carolina, Charlotte Division, the Honorable Frank D. Whitney presiding.

------- ◊ -------

## STATEMENT OF ISSUES

I.   *WHETHER THE EVIDENCE WAS SUFFICIENT TO SUPPORT APPELLANT'S CONVICTIONS*

II.  *WHETHER THE COURT ERRED IN RESTRICTING APPELLANT'S RIGHT TO CONFRONT AND CROSS-EXAMINE A GOVERNMENT WITNESS IN VIOLATION OF THE CONFRONTATION CLAUSE AND ITS PRETRIAL ORDER*

III. *WHETHER THE COURT ERRED IN FAILING TO CONSIDER THE PREJUDICE VERSUS PROBATIVE VALUE OF PERMITTING THE GOVERNMENT TO COMPEL APPELLANT'S FORMER ATTORNEY TO TESTIFY AGAINST HIM*

IV.  *WHETHER THE COURT ERRED IN APPLYING MULTIPLE SENTENCE ENHANCEMENTS, RELYING LARGELY ON ACQUITTED CONDUCT*

------- ◊ -------

## STATEMENT OF THE CASE

Izzat Freitekh and his son, Tarik, were indicted on December 16, 2020, in the Western District of North Carolina. The government superseded on August 17, 2021. [Doc. 34][JA28].

1

Izzat[1] was charged with: Conspiracy to Commit Wire Fraud; Bank Fraud; Conspiracy to Commit Money Laundering; Money Laundering and Making False Statements to Law Enforcement Agents. Izzat and Tarik were tried from March 8-17, 2022, before a jury. The jury acquitted Izzat of three counts, but convicted him on Counts: Three (money laundering conspiracy); Five through Seven (money laundering) and Eight (false statements). [Trial Transcript Vol. 8 ("T8") at 12][JA1945]. Tarik was convicted on all counts except Six. [T8:13][JA1934]. Izzat received an aggregate sentence of forty-eight months' incarceration. [Doc. 172][JA1945]. Izzat filed a timely notice of appeal on January 11, 2023. [Doc. 176][JA2160].

------- ◊ -------

## STATEMENT OF FACTS

### A.   *The Paycheck Protection Program ("PPP")*

There are very few PPP eligibility requirements under the CARES Act, and no underwriting mandates. It merely requires that an applicant (1) is a small business concern or any business concern, nonprofit organization, veterans organization, or Tribal business concern described in §31(b)(2)(C) of the Small Business Act; (2) does not employ more than the greater of 500 employees or, if applicable, the size standard in number of employees established by the Administration for the industry in which the business concern, nonprofit organization, veterans organization, or Tribal business concern operates; (3) was in operation on February 15, 2020; and (4) either had employees for whom the borrower paid salaries and

---

[1] Izzat and his son, Tarik, will be referenced by first name throughout this brief.

payroll taxes, or paid independent contractors as reported on a Form 1099-MISC. In re Springfield Hosp., Inc., 2020 WL 2125881 at *5 (Bankr. D.Vt. 2020).

Trial evidence was consistent with this description. Cf. [T2:15-16][JA462-463].

"[T]he majority of [PPP] funds" were intended, "to help business owners pay their employees to keep people employed and making a paycheck, payroll protections" and, "other utilities [and] expenses." [T2:16][JA463]. Applications were "submitted to financial institutions that were already approved 7(a) lenders." [T2:20][JA467]. Karen Hoskins from the Small Business Administration ("SBA") testified, "[i]t's the lender's loan. The lender approved the loan." [T2:38][JA485]. Once submitted to the SBA, "the lender created a note, borrower executed it, and loans would be put into their business bank account." [T2:21][JA468]. This was, "all done electronically." Id.. Loan applications recorded, "the IP address which is used to apply for the PPP loan." [T2:131][JA578]. Applicants were required to provide "truthful and accurate information" to obtain the loan. [T2:58][JA505]. If the loan proceeds were used as intended, "the borrower would then present a forgiveness application to their lender." [T2:33][JA480].

### B.  Izzat's Businesses

#### 1.  La Shish Kabob Restaurant ("LSK")

Izzat is the proprietor of several small business, most prominently LSK, in Charlotte. Like many restaurants, LSK was adversely affected by the Pandemic: "some days we don't work and some days we make like $100. Just nobody coming." [T6:107][JA1621].

LSK applied[2] for PPP through Lendio, a "matchmaker and a facilitator of small business loans." [T3:35][JA783]. The application indicated a monthly payroll[3] of $60,000 for sixteen employees and requested, "[$]150,000." [T3:40][JA788]. A 2019 tax return for the owners and a payroll summary for La Shish Catering ("LSC")[4] were submitted as well. See [T3:44][JA792]. The application was completed and, "electronically signed," on April 27, 2020. [T2:262][JA709]. Nobody "engage[d] in any" direct communications with the applicant.[5] [T2:284-86][JA731-733]. Logs from Lendio showed:

> from the time that that particular account was created
> on the Lendio platform, which is April 7, 2020, up
> until the point of April 9, 2020, which is the time
> frame where the application was actually submitted,

---

[2] The applicant for this loan was Iman Freitekh, Izzat's wife and Tarik's mother. [T2:261][JA708].
[3] The loan amount is based on the number of employees and the payroll information. [T3:35-36][JA783-784].
[4] It is unclear why a payroll summary for LSC was submitted in support of La Shish *Kabob*'s application.
[5] Lendio communicated *via* text message with a number associated with Tarik concerning the loan application. [T5:123][JA1395].

all the supporting documents were actually uploaded,
the certifications were clicked and submitted. That
time frame, there were – all 359 events were from the
same IP address, and that's the IP address
172.8.146.192. [T5:51][JA1323].

United States Postal Inspector Mark Heath traced the IP address
ending in 192 to an address in Glendale, California; Tarik was
listed as the subscriber. [T5:54][App.1326].

Customers Bank ultimately funded LSK's loan for $150,000 on
May 5, 2020.[6] [T3:106][JA854].

### 2.    *Green Apple Catering ("GA")*

Izzat started GA "because other businesses were under his
social security number, and he wanted the LLC so no one can be
after him." [T3:292][JA1040].

GA filed its articles of organization on March 18, 2020,
with Izzat as its registered agent. [T2:136][JA583]. GA
submitted a PPP application through Bank of America ("BOA") for
$1,000,000. [T2:24][JA471]. The application claimed an average
monthly payroll of $400,000 for twenty-five employees. Id.. The
purpose of the loan was, "[f]or payroll, mortgage interest,
utilities." [T2:114][JA561]. The application was submitted to
BOA on May 1 and 6, 2020, from Tarik's IP address. [T5:79-
81][JA1351-1353]. BOA fully funded the loan on May 14, 2020, and

---

[6] The business was also referred to as IMS Food d/b/a La Shish
Kabob at times.

closed GA's account on June 26, 2020, with a final balance of $977,607.63. [T2:129;137][JA576;JA584].

### 3.   LSC

Izzat started LSC after expanding LSK in 2017. [T6:98][JA1612]. LSC's PPP application and supporting documents were submitted to BOA between April 14 and 30, 2020, from Tarik's IP address. [T5:77-78][JA1349-1350]. It listed eleven employees and an average monthly payroll of "[$]45,000." [T6:98][JA1612]. The application requested, "[$]135,000" for, "equipment." [T2:150-51][JA597-598]. A "payroll summary 2019" for LSC, claiming thirteen employees and a total payroll expenditure of "[$]1.18 million," was submitted. [T2:157-58][JA604-605]. An addendum claimed an average monthly payroll of, "[$]120,000," and included a tax form reflecting, "total payments to all employees [of $]1,440,000" for 2019. [T2:154-55][JA601-602]. It included a document reflecting "wages, tips and other compensation" for the first quarter of 2020 totaling, "[$]360,000," and total deposits of, "$146,591.50." [T2:156][JA603]. The SBA funded LSC's $300,000 loan on May 5, 2020. [T2:29-30][JA476-477].

### 4.   Aroma Packaging ("Aroma")

Aroma was created to handle the sale of specialty food products. [T6:99][JA1613]. Aroma's application was submitted on April 13, 2020, claiming an average monthly payroll of $34,000

for eight employees. [T2:138-39][JA585-586]. It claimed "total payments to employees of 1,440,000," for 2019, "[$]512,750," in federal tax and "[$]82,800" in state taxes paid in 2019. [T2:145-46][JA592-593]. This, the application claimed, created a maximum eligibility of, "[$]350,000." [T2:144][JA591]. Aroma's application was submitted entirely from Tarik's IP address. [T5:69][JA1341]. Heath also testified about "a series of documents" which were uploaded on April 16 and 27, 2020, from, "the same IP address ending 192." [T5:75][JA1347]. BOA funded Aroma's $300,000 loan. [T2:137][JA584].

### C.   *The Investigation*

BOA learned that a client could not get PPP because its EIN had already been used to obtain funding for LSC. [T2:105-06][JA552-553]. Further investigation showed that Aroma and GA had also submitted applications to BOA, each listing Izzat as the owner. [T2:107][JA554]. BOA found other irregularities in the applications. [T2:107-08][JA554-555]. An IRS records custodian testified that the IRS records submitted with the applications were not accurate. [T3:119-26][JA867-874].

Special Agent Brian Park of the IRS reviewed six bank accounts for GA, LSC and Aroma as well as those entities' PPP applications. [T3:140][JA888]. Park concluded that the applications and supporting documents contained falsified information. [T3:173-82][JA921-930]. Park did not, "do any

7

analysis to see [on] what computer" the bogus payroll summaries had been composed. [T3:223][JA971].

"On May 6, 2020, there was a $300,000 deposit with a memo line that indicated it was from the PPP program into Aroma's account." [T3:202][JA950].[7] Park noted, after transferring seventy thousand dollars *into* the account, "[t]he next three transactions were transfers out to [other] accounts." [T3:203][JA951]. This was not unusual: "money was frequently transferred between the different bank accounts." [T3:216][JA964]. Park agreed that, "[t]here were plenty of expenses towards supplies that could have gone on a PPP loan application but weren't on the application [he] looked at," as well as "other expenses … like rent, electricity," etc. [T3:217-18][JA965-966]. Park identified several large checks payable to Freitekh family[8] members throughout May of 2020:

- "a $30,000 check written to Yasmin Freitekh with a notation, '[p]aycheck.'" [T3:194-95][JA942-943];
- a check to, "Nafiseh Freitekh for $30,000, and the memo line reads '[p]ayroll.'" [T3:195][JA943];

---

[7] Both Izzat and Tarik had signature authority over this account. [T3:240-41][JA687-688].

[8] The Freitekhs are a large family. Izzat has, "[s]even daughters … Razan, Fouleh, Yasmin, Mallack, [Haya], Alma and Dania." [T3:291][JA738]. Izzat's sister, Nafiseh, whom the record shows has been in his care since brain surgery, is also close to the family.

- "a check[9] to Ms. Haya [Freitekh] for $30,000." [T3:196][JA944];
- "$30,000 to a Mallack Freitekh." [T3:197][JA945];
- "[$]30,000 to Ms. Razan Ghatani, and the memo line reads 'Payroll.'" [T3:198][JA946];
- a check, "addressed to Mrs. Iman Freitekh for $44,500." [T3:199][JA947];
- a check,[10] "for Dania Freitekh for $30,000," with a "memo line [which] reads 'Payroll.'" [T3:199][JA947];
- a check to Jaxiver Lorenzi for "$30,000 with the memo line 'Payroll.'" [T3:208][JA956].

None of the recipients of the checks appeared "on [the] payroll summary included with the PPP applications," though some of the checks included a notation that, "looked to be either paycheck or payroll." [T3:202][JA950].

Izzat freely admitted that he used some of the funds received to give "each child[11] $30,000," because, "he owed them money and they worked with him all his life." [T4:33-34][JA1087-1088]. Most of his children had, on and off, worked at LSK for years. [T6:96-97][JA1610-1611]. He, "wanted to give it back to them because it is the right thing to do before God." [T6:167][JA1681]. Izzat identified the check made out to Dania as, "from the loan that the government gave me which I know that

---

[9] This was check 2020 from La Shish Catering's account, the subject of Count 5 of the Superseding Indictment. [Doc. 34 at 18][JA45].

[10] This check was the subject of Count 6 of the Superseding Indictment. [Doc. 34 at 18][JA45].

[11] Izzat did not pay Fouleh or Alma, teenagers, or Tarik, "[b]ecause Tarik does not work with him and he works – he works on his own." [T6:128][JA1642].

I have to pay back in two years 1 percentage." [T6:127][JA1641].
He wrote the check to Lorenzi, his son-in-law, "to replace the
AC system at the restaurant." [T6:159][JA1673]. Izzat agreed
that his signature appeared on the check to Lorenzi and that he
wrote the dollar amount, but noted the payee name was, "not
[his] handwriting." [T6:167-68][JA1681-1682]. Izzat also denied
that he wrote a "payroll" notation on any checks.
[T6:159][JA1673].

Izzat requested – and voluntarily participated in – a
proffer with the government on July 27, 2020. The "takeaway" was
that a company called Kyber Capital was, "wholly responsible for
submitting all of those applications. He knew nothing about it."
[T5:85][JA1357]. Izzat was contacted by Kyber in March, 2020,
"over the phone, and they offered him this Government loan for
one percent[12] interest over two years." [T3:292][JA1040]. Kyber
"was supposed to get three percent of the loan proceeds" that he
received. [T3:293][JA1041].

Izzat provided a number of documents, including powers of
attorney, to the government during the interview.
[T3:298][JA1046]. Among those documents was an "SBA loan service
agreement" containing the address "360 East Second Street,

---

[12] Izzat was not aware that he could seek forgiveness of the
loan, but would not have sought the forgiveness for religious
reasons: "he would never take a loan without being responsible
of paying the interest or whatsoever." [T6:129-30][JA1643-1644].

number 800, Los Angeles, California 90012. And the phone number
is (877) 746-4344." [T3:300][JA1048]. Izzat directed Tarik to
pay $1000 to Kyber for preparation of the applications because
Izzat did not know how to use its payment service, Payoneer.
[T3:293-94][JA1041-1042]. He provided documentation
memorializing this payment. The ID for the recipient was,
"sevendigital007@gmail.com." [T3:296][JA1044].

Preston Odom, an attorney who had assisted Izzat, "with an
issue that he had with the bank and the freezing of funds that
happened," provided the Kyber documents to the government at
Izzat's request after his proffer session without altering them
in any way. [T4:106-07][JA1160-1161]. Izzat, *vis-à-vis* Odom,
passed Gov. Ex. 79, an email from, "SevenDigital007@gmail.com,"
and discussed it at the proffer. [T5:97][JA1369]. Izzat:

> said that he had received information from Kyber
> Capital, account number and routing number, to which
> he was supposed to be making payment for Kyber's
> services, for essentially Kyber applying for the loans
> on his behalf. This was where he was supposed to send
> the payment to. Id..

The Kyber envelopes were all sent from the same post office
in Glendale, California,[13] on May 11, 2020[14] and were purchased
with cash; their buyer could not be identified. [T5:93-

---

[13] The post office from whence the envelopes came was
"approximately .6 miles. So 10, 12 minute walk" from Tarik's
home address. [T5:96][JA1368].
[14] The Kyber documents, provided by Izzat, "were purportedly
executed April 4 of 2020." [T5:95][JA1367].

95][JA1365-1367]. There was no record of a company called "Kyber Capital" at the office at 360 East Second Street, Suite 800. [T3:269][JA1017]. The phone number "(877) 746-4344," was acquired in 2007 and was used by, "a marketing and advertising services business," in the "2019, 2020 time period." [T3:285][JA1033]. A Payoneer[15] account in Izzat's name paid $1,000 on May 5, 2020 to "Seven[16] Digital." [T5:103-04][JA1375-1376]. The recipient's web address was SMMlite.com. [T3:257][JA1005]. The billing address for the account was in Commerce, California. [T3:258][JA1006]. That company received no more payments from Izzat's account before or after the $1000 payment. [T3:256][JA1004].

Izzat "said [at the proffer] that he never, him or his wife, contacted the bank to check on the status of the loan." [T3:300][JA1048]. The government presented an email from "Iman.aub@hotmail.com, which identified as his wife's email," to a bank official. [T4:31][JA1085]. It also presented a second email from Iman's address, copied to Izzat, urging the same official to expedite deposit of the PPP funds so they could "take care of our employees and clients." [T4:33][JA1087]. Izzat

---

[15] Payoneer "is a financial services company. We're a money service business and a money transmitter, and we provide cross border payment services." [T3:251][JA1023].
[16] Seven Digital FZE listed Vishal Jain as the owner and was domiciled in the UAE. [T3:265][JA1037]. Izzat had, "[n]ever heard Seven Digital until I was in the trial court." [T6:164][JA1678].

told investigators he had never seen that email and denied writing either email himself. [T4:33;47][JA1087;JA1101].

Fouleh confirmed that Izzat was unable to correspond in English. [T6:184-85][JA1698-1699]. She had, "never seen my dad write an email. I think the only thing he knows how to do is forward an email because there's an arrow button, it's pretty easy." [T6:183][JA1697]. Consistent with this testimony, the government offered a number of exhibits showing emails which were forwarded from Izzat to other family members without any additional message:

- Gov. Ex.s 170 and 171, received, "on April 27," advertised PPP and were forwarded to Tarik and Haya. [T5:41-42][JA1313-1314];
- Gov. Ex. 172 stated that a duplicate loan application had been cancelled and was forwarded to Haya. [T5:42][JA1314];
- Gov. Ex. 173 with the subject line, "[w]e have not received all of your loan application documents," was forwarded to Tarik. [T5:44][JA1316];
- Gov. Ex. 174 with the subject line, "Paycheck Protection Program: We're ready to receive your documents," was forwarded to Tarik. [JA1317];
- Gov. Ex. 103, with the subject line, "[i]mportant tax information," for GA was forwarded to Tarik. [T5:46-47][JA1318-1319];
- Gov. Ex. 6G1 with the subject line "SBA application No. 3600494783 COVID-19, EIDL advance status update," was forwarded to Tarik. [T5:48][JA1320].



------- ◊ -------

## SUMMARY OF THE ARGUMENT

The government failed to prove that Izzat knew that Tarik had obtained PPP loans by fraud. Rather, Izzat was himself a

victim of Tarik's fraud, having been tricked into providing sensitive information about himself and his businesses which enabled Tarik to submit the false loan applications. During the trial, the court violated Izzat's right to confrontation under the Sixth Amendment when it erroneously limited his cross-examination of Tarik's former attorney about communications with one of Tarik's co-conspirators. The court also erred under Rule 403 when it permitted the government to call Izzat's former attorney to testify against him about uncontested issues in the case. Finally, the court erred in applying several sentence enhancements to Izzat, in part because it relied on acquitted conduct to apply those enhancements.

------- ◊ -------

## ARGUMENT & CITATION OF AUTHORITY

### I. *THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN THE VERDICT*

"[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 318–19(III)(B) (1979).

#### A. *False Statements*

"The elements of a false statement conviction under 18 U.S.C. §1001 are: (1) the defendant made a statement; (2) the statement was false; (3) the defendant knew the statement was

false; (4) such statement was relevant to the function of a federal department or agency; and (5) the false statement was material." United States v. Algee, 599 F.3d 506, 512 (6th Cir. 2010).

Count Eight focuses on 1) Izzat's use of an email account shared with his wife, Iman and 2) the Kyber envelopes. Because the government failed to establish that Izzat knew about Tarik's fraud, it failed to establish that he knowingly made false statements. [Doc. 34 at 19][JA46].

### 1. Use of Izzat's email

Count Eight alleges that Izzat falsely claimed that, "[n]either Izzat Freitekh nor Individual A [Iman] used the Individual A Email Account or the Izzat Freitekh email account." [Doc. 34 at 19][JA46]. Izzat never claimed that they did not "use" their email accounts *at all*. Failing evidence that he did so means the record does not sustain the verdict.

The government may point out that Izzat, "said that he never, him or his wife, contacted the bank to check on the status of the loan." [T3:300][JA1048]. The government impeached this statement with Exhibit 41L, an email from "Iman.aub@hotmail.com" to a bank official and another email to the same official with a "a copy on the email Izzat.com, Alma@gmail.com." [T4:31][JA1085]. Izzat's understanding of English sheds light on who actually sent the emails.

15

[T4:43][JA1097]. At the proffer, the government's interpreter, "didn't translate everything," but agreed that there were, "[s]ome questions and answers that he didn't understand, so he would ask me." [T3:289][JA1037]. Lucy Sanchez, a BOA employee, helped Izzat obtain an EIN number and noted, "a language barrier." [T6:65-66][JA1579-1580]. Izzat testified, initially in English then, at the request of the court and court reporter, through an interpreter. [T6:103][JA1617]. He cannot read English. [T6:92][JA1628]. He communicates with his family in Arabic. [T6:185][JA1699]. Fouleh testified, "I've never seen my dad write an email." [T6:183][JA1697]. He explained, "[i]n my business I good English. I, like, but, like, emails, something like this, like when I go to the doctor,[17] I need somebody to help. If I need to buy something online, I need somebody to help. But with customer, nice. I'm OK." [T6:92-93][JA1628-1629]. The menu at LSK has pictures for the various dishes, which Izzat identifies by number. [T6:89-90][JA1625-1626].

Izzat denied any knowledge of either email. [T4:33;47][JA1087;JA1101]. He testified that Iman "didn't know English to send" the email to Chavarria. [T4:32][JA1086]. Heath conceded that the emails he reviewed from Izzat's account did not contain any writing produced by their sender, "they're

---

[17] Izzat sought an Arabic-speaking accountant at one point because he needed assistance with more technical language. [T4:60][JA1114].

forwarding emails from Bank of America related to Intralinks' portals." [T5:146][JA1418]. Tarik had unfettered access to his parents' email accounts. Heath testified that he reviewed IP data related to Izzat's email account and that investigation showed, "login events to [Izzat's] account from [Tarik's] IP address." [T5:155-156][JA1427-1428].

Thus, the government failed to meet its burden, both because the record shows that multiple individuals, including Tarik, used Izzat's email and because the sender's English comprehension was incompatible with Izzat's command of the language.

### 2. The Kyber envelopes

Izzat performed the labor and boots-on-the-ground management for LSK, leaving the administration/bookkeeping to the rest of his family. He relied on English-speaking family members to write words on checks after he filled in the numbers. [T6:168][JA1682].

Similarly, Izzat relied on Tarik (posing as Kyber) to guide him through the PPP application process and its terms and requirements, e.g. that his only obligation was, "to pay back in two years 1 percentage." [T6:127][JA1641]. The record incontrovertibly shows Tarik submitted the PPP applications and supporting documents. It shows that he was accessing Izzat's email account from California, likely to forward himself and

17

other co-conspirators the emails concerning the loans in Izzat's account or to communicate with lenders himself. [T5:41-48][JA1313-1320]. IP data proved Tarik repeatedly followed up on - and communicated about - the progress of the Lendio application. [T5:123][JA1395].

The record is fully consistent with Izzat's earnest belief that: 1) his son had arranged for Kyber to prepare the PPP applications; 2) Kyber submitted those applications and 3) the applications were based on legitimate information, access to which he had provided in good faith. Heath confirmed there was no evidence of Izzat supervising the application process, nor did Izzat send or receive any messages discussing the alteration of documents. Had Heath discovered any such messages, he "would have flagged them pretty quickly." [T5:148][JA1420].

The government's arguments that Izzat was aware that this was all a fraud rely not on objective evidence and more on inferences drawn solely from Izzat and Tarik's familial relationship, which cannot establish a criminal conspiracy. See e.g. United States v. Burton, 126 F.3d 666, 670(I)(5th Cir. 1997)(holding that "familial relationships alone will not support a conspiracy conviction").

Izzat was a victim of Tarik's fraud. His belief in Kyber was the result of Tarik's misrepresentations. The evidence overwhelmingly indicates that the individual who initially

18

called Izzat purporting to be Kyber was likely Tarik's friend,
Vishal Jain, Seven Digital's owner who received the $1000
Payoneer payment. In a text to Haya, Tarik discussed his
"friend['s]" website, "SMMLite.com," whose business, the record
reflects, was, "beefing up individual social media profiles and
their online presence." [T5:101][JA1373]. Seven Digital used the
email "SMMLite.com" with a billing address in Commerce,
California.[18] [T3:257-58][JA1029-1030]. Izzat authorized Tarik to
pay Kyber, *nee* SMMLite. It is difficult to conceive that the
authority did not come after cajoling from Tarik. The envelopes
were all sent from a post office in Glendale, less than a mile
from Tarik's home address. [T5:93][JA1365]. Tarik extracted
$1000 from Izzat for Kyber's fee, to buy himself, "credit" with
SMMLite, rendering Izzat a *victim* of his fraud, not an
*accomplice*. [T5:102][JA1374]. Izzat's trust in Tarik caused him
to tell the government that Kyber was, "wholly responsible for
submitting all of those applications." [T5:85][JA1357]. Izzat
provided documentation memorializing this payment at the
interview. [T5:97][JA1369].

Izzat lacked the intent to make false statements because he
did not know they were false.

---

[18]    Commerce is seventeen miles from Glendale. See
https://maps.app.goo.gl/-p64cv6gMNPKVK5e58.

19

**B.   *Money Laundering***

**1.   *Actual subjective knowledge***

"A conviction under §1957 requires proof that [Izzat] knowingly engaged or attempted to engage in a monetary transaction in criminally derived property that is of value greater than $10,000 and is derived from specified unlawful activity." United States v. Lander, 668 F.3d 1289, 1297(III)(A)(1)(11th Cir. 2012).[19] §1957 "requires actual subjective knowledge" of the illicit nature of the funds and a defendant, "cannot be convicted on what she objectively should have known," absent willful blindness. United States v. Campbell, 977 F.2d 854, 857(II)(4th Cir. 1992). Evidence that "merely casts him in a suspicious light," is not sufficient. United States v. Messer, 197 F.3d 330, 344(III)(B)(9th Cir. 1999).

If Izzat had known about Tarik's fraud any sooner than May 7, 2020, the jury would not have acquitted him of fraud. "[E]very single certification for every loan," as well as, "[e]very document that was submitted," as part of the applications originated from Tarik's IP address. [T5:139-141][JA1411-1413]. The last Lendio login from Tarik's IP address, "occurred on April 27, 2020" and Tarik flew from Los

---

[19] All quotes herein omit citations and internal quotations unless noted.

Angeles to Charlotte on May 22, 2020. See [T5:51;63][JA1323;JA1335]. The next log event came on May 23, 2020 from the IP address of Izzat's wireless router. [T5:61-62][JA1321-1322]. "[T]he final 40 log events," were, "all from that particular IP address." [T5:51][JA1323]. Tarik, at times pretending to be Kyber, continued to control the application scam surreptitiously.

The evidence must establish that Izzat learned about Tarik's fraud between May 8, 2020, and May 18, 2020,[20] to support his money laundering convictions. Heath did not discover any evidence inculpating Izzat, such as communications directing others to forge documents, but *did* flag a number of communications between Tarik[21] and Haya from May 14-16 which are highly relevant. The texts suggest that Tarik was soliciting Haya's assistance. He noted the windfall his friend experienced, but cautioned that "you have to spend 75 percent on payroll." [T5:38-39][JA1310-1311]. The next day when he assured her that, "they forgive it," Haya responded with a key question: "in case they don't [forgive the loan], do we get in trouble?" [T5:39][JA1311]. Telling the same lie he told his father *sub nom*

---

[20] Count Five alleged that he laundered funds by writing a check on that date. See [Doc. 34][JA28].

[21] Heath produced multiple text messages between March and April, 2020, from Tarik attempting to purchase luxury automobiles, demonstrating he was not relying on anyone else to launder the money he obtained. [T5:110-15][JA1382-1387].

Kyber, Tarik told his sister, "[w]e pay it in two years, only 1 percent rate," omitting any discussion of loan requirements. [T5:39][JA1311].

Haya was intimately involved in the business's activities, beyond working at the restaurant part-time. Many of the emails which the government argued established Izzat's knowledge[22] of Tarik's fraud were forwarded to Haya. [T5:41-42][JA1313-1314]. In her text exchanges with Tarik, Haya noted LSK's new social media followers, courtesy of the $1000 Izzat authorized Tarik to use for Kyber. Tarik pressured Haya because she helped Izzat with check writing and had special access to their father's business dealings. [T6:167][JA1681].

Tarik took advantage of Izzat's trust in his family, his reliance on them to conduct the business's administrative tasks, his lack of command of English and his desperation to protect his businesses at the onset of the Pandemic. Although Izzat assumed responsibility for the checks that were written to family members, if he wrote them at all, it was only the numbers and his signature, not the English words. Respecting Haya's husband, Jaxvier Lorenzi Izzat explained: "I filled out the written dollar amount and the numeral dollar amount, the date

---

[22] In order for Izzat to gain knowledge from an email, he would need to be able to read it.

22

and I signed. But the name that's not my handwriting." [T6:167-68][JA1681-1682].

Lorenzi's check is the most problematic transaction within the May 8-18 window, but it, "merely casts [Izzat] in a suspicious light," which is not – and should not be – sufficient evidence of subjective knowledge to sustain his §1957 convictions. Messer, 197 F.3d at 344(III)(B). The check was written out of the GA account on May 27, 2020, about two weeks after GA had been loaned $1,000,000 in PPP, which Izzat pinpointed as the date he started to "feel" that, "something was wrong." [T6:134][JA1648]. Izzat testified that Lorenzi, "did work for me at the house, and I wanted him to replace the AC at the restaurant." [T6:159][JA1673]. Even assuming the check was written with Izzat's knowledge and assent, there is no evidence showing that he gave that assent with "actual subjective knowledge" that the funds being used were the product of fraud. Campbell, supra. Rather, he, "believed [Tarik]'s explanation" about Kyber and the funds exceeding the amount he needed, which he was seeking to resolve with Joseph Miner at BOA. [T6:76-77;134][JA1590-1591;JA1648]; Campbell, 977 F.2d at 858(II).

### 2. Conspiracy

Izzat's conspiracy conviction fares no better for the same reasons discussed, supra. See United States v. Heaps, 39 F.3d 479, 488(III)(C), n.* (4th Cir. 1994).

23

## II. LIMITING IZZAT'S CROSS-EXAMINATION OF A GOVERNMENT WITNESS VIOLATED HIS CONFRONTATION RIGHT

This Court, "review[s] for abuse of discretion a trial court's limitations on a defendant's cross-examination of a prosecution witness." United States v. Smith, 451 F.3d 209, 220(III)(B)(3)(b)(4th Cir. 2006). It reviews a court's "evidentiary rulings, including rulings on privilege, for abuse of discretion, but we review factual findings as to whether a privilege applies for clear error, and the application of legal principles *de novo*. By definition, an abuse of discretion occurs if the court commits [a]n error of law." Kinder v. White, 609 F. App'x 126, 129(II)(4th Cir. 2015).

The Seventh Circuit has stated that, "where limitations directly implicate the Sixth Amendment right of confrontation, we review the limitation *de novo*. Thus when deciding whether limits on cross-examination are permissible, we must first distinguish between the core values of the Confrontation Clause and more peripheral concerns which remain within the trial court's ambit." United States v. Smith, 454 F.3d 707, 714(II)(A)(7th Cir. 2006).

### A. Izzat Had A Right To Cross-Examination

"A primary interest secured by [the Confrontation Clause] is the right of cross-examination." Davis v. Alaska, 415 U.S. 308, 315(2)(1974). The right, however

is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process. But its denial or significant diminution calls into question the ultimate integrity of the fact-finding process and requires that the competing interest be closely examined. U. S. ex rel. Blackwell v. Franzen, 688 F.2d 496, 500 (7th Cir. 1982).

Courts often confront the tension between Sixth Amendment confrontation rights and the various statutory and common law privileges accorded witnesses. See e.g. Davis, 415 U.S. at 320(3)(noting that a state's desire to protect a witness's privilege against having his juvenile record exposed, "must fall before the right of petitioner to seek out the truth in the process of defending himself"). See also Douglas v. Alabama, 380 U.S. 415, 419-20(I)(1965)(holding that the opportunity to cross-examine other witnesses about a statement allegedly made by a co-defendant who had asserted his Fifth Amendment privilege was not "adequate to redress this denial of the essential right secured by the Confrontation Clause").

Where a government witness's "assertion of the privilege unduly restricts a defendant's cross-examination, the witness' direct testimony may have to be stricken." United States v. Coven, 662 F.2d 162, 170-71 (2d Cir. 1981). To make the right to cross-examination, "effective," a court must permit defense counsel, "to expose the jury to the facts from which jurors, as the sole triers of fact and credibility, could appropriately

draw inferences relating to the reliability of the witness."
Davis at 318(2).

Prior to trial, the court granted a motion to withdraw by
Fialko, Tarik's then-attorney, who had been identified as, "a
necessary witness in the trial." [Doc.s 46&55][JA59; JA80]. The
government represented that it was seeking Fialko's testimony,
"to lay the foundation for the screenshots' admission[23] into
evidence." [Doc. 55 at 6][JA85]. One of the screenshots showed a
text message, allegedly to Tarik, on April 29, 2020:

> Man, why you don't answer. My team worked so hard with
> bank and SBA to approve, and I got you a big number.
> Why you don't send me my 3 percent? You keep ignoring.
> It's not good. I only was paid $1,000.
> [T5:99][JA1371].

Fialko, the government claimed, was, "the only witness who
can authenticate these documents to say, 'I turned them over
exactly in the format we've got them,'" and, "[t]hat the
information either came from the defendant or was turned over
with the defendant's knowledge." [Doc. 195 at 19-20][JA2182-
2183].

Both defendants moved to quash Fialko's subpoena. See
[Doc.s 71&77][JA101;JA134]. Izzat argued that Fialko's testimony
would infringe on his Confrontation Clause rights if the court
were to permit Fialko to invoke privilege during cross-

---

[23] The superseding indictment charged Tarik with providing the
government (through Fialko) with screenshots of a fabricated
conversation to thwart the investigation. [Doc. 34 at 20][JA47].

examination. See [Doc. 195 at 42][JA2205]. The court ruled that Fialko's testimony, "would clearly be relevant and material to proving the 1001 charge, and no other witness can provide the information given that the allegation is that Fialko submitted the screenshots containing communications between Tarik and a third party regarding Kyber Capital on behalf of his client." [Doc. 195 at 74-76][JA2237-2239]. It concluded, "defendants have failed to raise a valid confrontation clause issue and, therefore, are not entitled to any pretrial limitations on the defendants' ability to cross-examine Fialko." [Doc. 195 at 77-78][JA2240-2241].

Fialko was compelled to tell the jury that the screenshots arrived *via* email from, "rashanvermking@hotmail.com." [T4:112-113][JA1166-1167]. The name associated with the email was, "Rashan Verm." [T4:113][JA1167]. Fialko proffered that he did make "a couple of attempts" to send emails in response to "rashanvermking@hotmail.com," "within five to seven days after I received it." [T4A:13-14][JA1253-1254]. He had no further communication with that individual. [T4:116]. The email contained links to three screenshots of concocted messages purporting to chronicle Tarik's dealings with Kyber. [T4:113][JA1167]. Heath testified about the April 29, 2020, message complaining about "only" being paid $1000, thoroughly debunking the authenticity of the screenshots, which predated

the referenced $1000 payment to Payoneer. <u>See</u> [T5:99-100][JA1371-1372].

The message from "Rashan Verm," also contained, "a sentence or two from Mr. King." [T4A:15][JA1255]. At an *in camera* hearing, Izzat's attorney asked, "[d]o you recall the sentence or two?" to which Fialko invoked attorney-client privilege. <u>Id.</u>. The court sustained Tarik's objection, but made a record of his response in a closed courtroom with only counsel and his former client present. [T4A:15-16;T4B][JA1255-1256]. Based on Fialko's testimony, the court maintained its ruling. [T4A:17][JA1257]. Counsel also drew an objection by asking Fialko whether Tarik, "ever t[old] you that [Izzat] had any involvement in sending that email?" Fialko responded, "I think I already answered that one. No." [T4A:18][JA1258].[24]

The court precluded most of Izzat's examination based on its conclusion that some of the questions posed – as well as any follow-up questions – intruded on Tarik's attorney-client privilege. [T4A:15-17][JA1255-1257]. This prevented Izzat from establishing through Fialko that Izzat did not direct someone else to send the screenshots, nor was he able to elicit testimony about the relationship between the co-conspirators

---

[24] It appears that the transcript errantly included Fialko's response to the question, which the court intended to be, "not available" to trial counsel, in Volume 4A of the trial transcript. [T4A:18][JA1258].

"Rashan Vern" and Tarik, based on what "Rashan Vern" stated to Fialko in the email. [T4A:15-17][JA1255-1257]. Counsel also was prevented from exploring Tarik's potential involvement in the creation of yet another bogus document creating a paper trail to Kyber Capital, based on Tarik's attorney-client privilege.

The court indisputably limited Izzat's right to cross-examine Fialko in deference to Tarik's attorney-client privilege. [T4A:15-17][JA1255-1257]. This, *prima facie*, violates Izzat's right to confront Fialko, because it prevented him from examining Fialko about "details of his direct testimony," which "bore on a fundamental part of the [government]'s case against" Izzat: who provided Fialko with the bogus messages and what was their relationship to Tarik? United States v. Cardillo, 316 F.2d 606, 611 (2d Cir. 1963).[25] See also Douglas, 380 U.S. at 420.

In addition to violating Izzat's Confrontation Clause rights, the court's decision directly contravened its own ruling that Tarik had "failed to satisfy [his] burden of showing that the attorney-client privilege or work product doctrine applies

---

[25] Cardillo distinguished between situations, "in which the assertion of privilege merely precludes inquiry into collateral matters which bear only on the credibility of the witness and those cases in which the assertion of the privilege prevents inquiry into matters about which the witness testified on direct examination." 316 F.2d at 611. A situation like the present, where the privilege, "precludes inquiry into the details of his direct testimony," is the more serious one, since, "there may be a substantial danger of prejudice because the defense is deprived of the right to test the truth of his direct testimony." Cardillo at 611.

to the testimony the Government seeks to elicit related to … the source of the screenshot," since it, "was not intended to be kept confidential" and, besides, Tarik had, "clearly waived the attorney-client privilege when Fialko … provided the relevant screenshots." [Doc. 195 at 75][JA2238].

If Tarik waived the privilege for one, he waived it for all. See e.g. In re Martin Marietta Corp., 856 F.2d 619, 623-24 (4th Cir. 1988) cert. denied 490 U.S. 1011 (1989). The only limitation the court placed on its ruling was that "the *purpose of producing*" the screenshots could not be explored. [Doc. 195 at 76-77][JA2239-2240]. By breaching the privilege[26] on behalf the government, but not Izzat, the court misapplied the law regarding waiver of attorney-client privilege. See Martin Marietta Corp., 856 F.2d at 623-24.

If "Rashan Verm" was merely Tarik's alias, it repeats his pattern of using aliases to attempt to trick of defraud. This was very important to Izzat's defense, since Tarik deceived him, just as he did the banks and the government, concerning Kyber Capital. Exposing Tarik's role in this deception supports Izzat's position that he earnestly believed that Kyber Capital

---

[26] It is not apparent why the court precluded counsel's questions based on privilege. If "Rashan Verm" was not an alias for Tarik, then it was a communication from a third party to Fialko, which would not be covered within Tarik's attorney-client privilege. See e.g. F.T.C. v. Cambridge Exchange, Ltd., Inc., 845 F.Supp. 872 (S.D. Fla. 1993).

had handled his PPP applications and had obtained the loans for him, meaning he wrote the checks without "actual subjective knowledge" that they were the product of a criminal venture. Campbell, supra.

Tarik's privilege, then, should have yielded to Izzat's right to confrontation *vis-à-vis* cross-examination in this situation. See Davis at 318(2).

### B. Harm

A court's error in limiting cross-examination is reviewed for harmless error. See Smith at 222(II)(B)(3)(c).

> [w]hether an erroneous evidentiary ruling is harmless in a particular case rests upon an analysis of a host of factors, including: the importance of the witness's testimony in the prosecution's case; whether the testimony was cumulative; the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points; the extent to which cross-examination was otherwise permitted and, of course, the overall strength of the prosecution's case. Id.

"Harm is presumed to have come from the constitutional error, and the state has the 'heavy burden' of proving harmlessness beyond a reasonable doubt." Hoover v. State of Md., 714 F.2d 301, 306(III)(4th Cir. 1983). The reviewing Court, "must look at the evidence, and the reasonably possible effects of the error on the jury's consideration of that evidence." Anderson v. Warden, 696 F.2d 296, 300 (*en banc*)(4th Cir.1982).

The court's restriction[27] of Izzat's confrontation rights requires this Court to "presume" harm. Anderson, 696 F.2d at 300. The jury's verdict reflects that Izzat did not know about Tarik's frauds any time prior May 7, 2020. See [T5:79-81][JA1351-1353]. Any evidence that he was aware subsequently would, at a minimum, be highly relevant to the money laundering conspiracy. Conversely, any evidence showing that Izzat was not a part of Tarik's machinations would undermine the government's theory of guilt.

"Rashan Verm" emailed Fialko more than six months after Izzat identified Kyber as the party responsible for the applications at his proffer. [T5:99][JA1371]. Showing that Tarik was once again fabricating documents – this time to blame someone else for preparing the applications – demonstrates not only Tarik's intent to deceive the banks, investigators, his attorney and his own family about who was responsible, but that there was someone who was able to send text messages to him *in English* who also knew about the scheme. Had Izzat been able to identify another individual as Tarik's accomplice, it would explain who was calling him in March, 2020, to obtain the sensitive information Tarik ultimately used to submit the

---

[27] Izzat was not privy to Fialko's responses to his two sealed questions and, therefore, could not ask relevant follow-up questions thereto. The Court's analysis should not be limited to the answers in the sealed volumes, then.

applications. [T3:292][JA1040]. Izzat was not able to do that, though, because the court prevented him from showing the jury that he had no association with "Rashan Verm," and that Tarik *did*.

Distinguishing Izzat's knowledge of the fraudulent activities related to Kyber from Tarik's (including Tarik's efforts at a cover-up) was a material factual issue which was otherwise not placed before the jury. See Smith, supra. The jury found Tarik guilty of Count Nine, accusing him of producing the bogus screenshots to the government. The screenshots themselves demonstrated Tarik's consciousness of guilt and Izzat should have been allowed to distinguish such consciousness from his own. The jury acquitted Izzat of all of the predicate acts alleged and the government's case for money laundering was no stronger. Evidence further distancing Izzat from Tarik's fraud may well have tipped the balance and the court's error was not harmless beyond a reasonable doubt. See Hoover, 714 F.2d at 306-7(III).

### III. ODOM'S TESTIMONY WAS MORE PREJUDICIAL THAN PROBATIVE

"[W]hen, after review of the record, we are left with a firm conviction that an abuse of discretion has occurred that has worked to the prejudice of a defendant, we must reverse." United States v. Simpson, 910 F.2d 154, 157(II)(4th Cir. 1990).

Where a criminal defendant's former attorney is called to testify as a witness at his trial, the testimony's probative value is normally outweighed by the danger of unfair prejudice to a party. "As a general matter, permitting counsel to be called as witnesses, even in a hearing out of the presence of the jury, is a step a court should ordinarily be reluctant to take. Even where the attorney no longer represents the client, the practice is strongly disfavored." United States v. Doyle, 2018 WL 1902506 at *19(B)(2)(b)(S.D.N.Y. 2018). "The mere appearance of an attorney testifying against a former client, even as to matters of public record, is distasteful and should only be used in rare instances." United States v. Cochran, 546 F.2d 27, 29 n.5 (5th Cir. 1977).

Odom was compelled to testify against Izzat, his former client. At the motion to quash, the court acknowledged that, "the Government will present evidence that Izzat provided the documents to the Government or at a minimum, that Izzat acknowledged the documents to the Government during the July 27, 2021 interview." [Doc. 195 at 78-79][JA2241-2242]. The court was, "unpersuaded," by Izzat's objections, holding that "such testimony is clearly relevant, material and no other witness can provide the information that Izzat allegedly gave Odom the false documents which Odom provided to the Government." Id. The Court

did not engage in the balancing test under Rule 403 on the record.

Heath testified that Izzat, *via* Odom, passed an email from, "SevenDigital007@gmail.com," and discussed it during Izzat's proffer session with him. [T5:97][JA1369]. Izzat:

> said that he had received information from Kyber Capital, account number and routing number, to which he was supposed to be making payment for Kyber's services, for essentially Kyber applying for the loans on his behalf. This was where he was supposed to send the payment to. Id..

Heath also testified to receipt of the other documents. [T5:90][JA1362]. Izzat never claimed that he did not pass those documents to Heath, did not object to their admission on authenticity or chain-of-custody grounds and did not cross-examine Heath or any other witness as to their origin.

Even so, Odom was compelled to testify to the jury that Izzat had provided him with the Kyber envelopes and then he provided them to the government without alteration. [T4:90-91][JA1144-1145]. Therein lies the undue prejudice: Odom's testimony was completely unnecessary. Izzat never contended – nor indicated he would contend – that he *did not* pass the documents or that Odom altered them. Not challenging that he passed the Kyber documents in the same condition that Heath received them was a necessary aspect to Izzat's defense that he

35

was an innocent victim of Tarik's scam and he never intended to claim otherwise.

"[P]rosecutors tend to pile on evidence of dubious admissibility or probative value even when the probative admissible evidence is overwhelming, because they want to guarantee a conviction." United States v. Williams, 698 F.3d 374, 384 (7th Cir. 2012). In Willams, the Court concluded:

> the government should not have called the defendant's former lawyer as a witness against his former client. The fact that it *was* his former lawyer testifying against him was likely to have a greater impact on the jury than the contents of his testimony warranted, since the contents were as we said not necessarily inconsistent with innocence. 698 F.3d at 384.

This is what happened here. Odom's testimony was completely unnecessary and was insisted upon for the theatrical value of having former counsel testify against his client.

## IV. *THE COURT ERRED IN APPLYING MULTIPLE SENTENCE ENHANCEMENTS*

"When considering a challenge to a court's application of the Guidelines, this Court reviews factual findings for clear error and legal conclusions *de novo*." United States v. Shivers, 56 F.4th 320, 324(III)(4th Cir. 2022).

Izzat's sentencing might as well have been conducted through a looking glass. He was sentenced based primarily, nearly exclusively in fact, on conduct for which he was acquitted by the jury. Even considering the court's downward

variance, the punishment bore no relation to the crime and was substantively unreasonable.

>   **A.  *The Court Used Acquitted Conduct To Enhance Izzat's Offense Level***

The Supreme Court's recent denial of *certiorari* in McClinton v. United States, 600 U.S. ___, 143 S.Ct. 2400 (June 30, 2023), came with anomalous "statement[s] … respecting the denial of *certiorari*," by four of the Justices. Justice Sotomayor noted, "the use of acquitted conduct to increase a defendant's Sentencing Guidelines range and sentence raises important questions that go to the fairness and perceived fairness of the criminal justice system." McClinton, 143 S.Ct. at 2401. The Court noted:

> [t]he Sentencing Commission, which is responsible for the Sentencing Guidelines, has announced that it will resolve questions around acquitted-conduct sentencing in the coming year. If the Commission does not act expeditiously or chooses not to act, however, this Court may need to take up the constitutional issues presented. McClinton at 2403.

The government and the court relied heavily on acquitted conduct to enhance Izzat's sentence and it is highly doubtful that *any* of the enhancements herein challenged would have been applied if not for the invocation of acquitted conduct. The court noted that, even though, "[t]he jury clearly made a distinction beyond a reasonable doubt level," it was nonetheless, "clear right now under the law that acquitted

37

conduct can still come back in a sentencing as long as the Government proves by a preponderance of the evidence." [Sentencing Transcript, ("S.") at 10-12][JA2255-2257].

Izzat notes for the record that acquitted conduct factored into his sentence, that he objected thereto and that the court's reliance on acquitted conduct "raises important questions that go to the fairness and perceived fairness of the criminal justice system" and specifically Izzat's rights under the Fifth, Sixth and Eighth Amendments. McClinton at 2401. The court therefore erred in relying on acquitted conduct. See Jones v. United States, 574 U.S. 948 (2014)(Scalia, J. dissenting).

### B. *The Court Was Not Authorized To Interpret "Loss" To Mean "Intended Loss"*

The court's, "interpretation of the term 'loss,'" is subject to *de novo* review. United States v. Savage, 885 F.3d 212, 227(V)(B)(4th Cir. 2018).

U.S.S.G. §2B1.1(b)(1) directs the sentencing court to calculate "[l]oss" to determine adjustments based on financial loss. There is abundant Commentary related to this Guideline:

- Application Note 3(A) states, "[s]ubject to the exclusions in subdivision (D), loss is the greater of actual loss or intended loss;"

- Note 3(A)(i) defines, "[a]ctual loss" as "the reasonably foreseeable pecuniary harm that resulted from the offense;"

- Note 3(A)(ii) defines, "[i]ntended loss" as "(I) … the pecuniary harm that the defendant purposely sought to

38

inflict and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur."

**1.   *The Guideline's text requires calculation of actual loss***

In Stinson v. United States, 508 U.S. 45, 38 (1993), the Supreme Court, held that, "provided an agency's interpretation of its own regulations does not violate the Constitution or a federal statute, it must be given 'controlling weight unless it is plainly erroneous or inconsistent with the regulation,'" thus requiring deferral[28] to guideline commentary.

At least one Circuit has held that, "the Supreme Court overruled Stinson[29] in Kisor, revising the weight courts should afford agency interpretations." United States v. Henderson, 64 F.4th 111, 119(III)(A)(ii)(3d Cir. March 29, 2023). Kisor held:

> a court should not afford Auer deference unless the regulation is genuinely ambiguous … if the law gives an answer—if there is only one reasonable construction of a regulation—then a court has no business deferring to any other reading, no matter how much the agency insists it would make more sense. Deference in that circumstance would permit the agency, under the guise of interpreting a regulation, to create *de facto* a new regulation. 139 S.Ct. at 2415(II)(B).

Following Kisor, the Third Circuit reviewed §2B1.1(b)(1) and held that, before according Auer deference, "a court must

---

[28] The Court explained that this has been referred to as Auer deference "[f]or the last 20 or so years." Kisor v. Wilkie, ___ U.S. ___, 139 S.Ct. 2400, 2411(II)(A)(2019). See also Auer v. Robbins, 519 U.S. 452 (1997).

[29] Stinson is specifically cited in Kisor as a "pre-Auer decision[] applying Seminole Rock deference." 139 S.Ct. at 2411 n. 3.

exhaust all the traditional tools of construction and determine that regulation is genuinely ambiguous." United States v. Banks, 55 F.4th 246, 255(II)(B)(3d Cir. 2022). The Court noted, "[t]he Guideline does not mention 'actual' versus 'intended' loss; that distinction appears only in the commentary. This absence alone indicates that the Guideline does not include intended loss." Banks, 55 F.4th at 257(II)(B). It considered "common dictionary definitions of 'loss,'" concluding that they, "point to an ordinary meaning of 'actual loss'" and, "[n]one of these definitions suggest an ordinary understanding that 'loss' means 'intended loss.'" Banks at 258(II)(B). In other words, because there is no ambiguity in the term "loss" in §2B1.1(b)(1), there is no reason to defer to the Commentary.

This Circuit has taken inconsistent positions on the issue. In United States v. Moses, 23 F.4th 347, 348 (4th Cir. 2022), a panel considered, "the enforceability of and the weight to be given the official commentary of the Sentencing Guidelines," and the related question of "whether Stinson was overruled by the Supreme Court's recent decision in Kisor v. Wilkie." Moses held, "Kisor did not overrule[30] Stinson's standard for deference owed

---

[30] The Moses panel noted, "close consideration of Stinson shows, as discussed herein, that while the Court drew from Seminole Rock, *it did not conclude the doctrine applied* to the official commentary of the Guidelines." 23 F.4th at 356(II) n.*. This is the only Court Izzat has found to have made such an assertion. Others have directly disagreed. See United States v. Dupree, 57

to Guidelines commentary but instead applies in the context of an executive agency's interpretation of its own legislative rules." 23 F.4th at 349. <u>See also</u> <u>United States v. Riccardi</u>, 989 F.3d 476, 484-86(II)(B)(2)(6th Cir. 2021); <u>United States v. Nasir</u>, 17 F.4th 459, 469-72 (3d Cir. 2021)(<em>en banc</em>).

Judge King pointed out that <u>Moses</u> broke with another Fourth Circuit panel's holding published twelve days prior in <u>United States v. Campbell</u>, 22 F.4th 438 (4th Cir. 2022). <u>See Moses</u> at 359 (King, J. dissenting in part). <u>Campbell</u> held that <u>Kisor</u>, "limited when courts will afford Seminole[31] Rock/<u>Auer</u> deference," and "instructs, if the inconsistency between U.S.S.G. §4B1.2(b) and its Commentary were not apparent from the plain text, we would turn to the 'traditional tools' of statutory construction to determine if U.S.S.G. §4B1.2(b) is 'genuinely ambiguous'" before deferring to the Commentary. 22 F.4th at 445(III). Using "the traditional tools of construction – and common sense," the Court held that it was unnecessary to refer to the Commentary because the guideline's terms were unambiguous. <u>Campbell</u> at 445(III).[32]

---

F.4th 1269, 1274(II)(A)(11th Cir. Jan. 18, 2023)(<em>en banc</em>)(holding that, "[r]elying on its decision in <u>Seminole Rock</u>, in <u>Stinson</u> the Supreme Court treated the Sentencing Commission's commentary to the Guidelines like an agency's interpretation of its own regulation").

[31] <u>Bowles v. Seminole Rock & Sand Co.</u>, 325 U.S. 410 (1945)

[32] The Court was presented with this precise issue – "whether the commentary defining 'loss' in Application Notes 3(A) and 3(F)(i)

Campbell should control this Court's decision.[33] As Judge King noted, "[w]hen published panel opinions are in direct conflict on a given issue, the earliest opinion controls, unless the prior opinion has been overruled by an intervening opinion from this court sitting *en banc* or the Supreme Court." McMellon v. United States, 387 F.3d 329, 333 (4th Cir. 2004)(*en banc*). The court found that Izzat was responsible for $1.75 million in *intended* loss, *versus* approximately $299,691 in *actual* loss. [S:21][JA2266]. The difference was significant: a 4-level increase in Izzat's base offense level. Compare U.S.S.G. §2B1.1(b)(1)(G) with U.S.S.G. §2B1.1(b)(1)(I).

The court and the government have, "skip[ped] past the text of [§2B1.1(b)(1)] to focus on its commentary." Campbell at 445(III) n.4. Loss, "just means what it means," which is what the Commentary calls "actual loss." Kisor at 2415(II)(B). The

_____

can be reconciled with the text of §2B1.1's 'loss' provision," in a plain error claim in United States v. Limbaugh, 2023 WL 119577 at *4(II)(B)(4th Cir. Jan. 6, 2023). The panel, which included Judge King, held that "[u]nder the circumstances, we cannot say that the district court committed 'clear' and 'obvious' error in treating as valid longstanding Guidelines commentary to which the defendant did not object." Limbaugh, 2023 WL 119577 at *4(II)(B). The value of an unpublished opinion, decided on a different standard, which emphasized that standard in reaching its decision and took, "no position on the underlying merits of Limbaugh's claims," appears minimal. Limbaugh at *4(II)(B).

[33] Citing Judge Silberman's opinion in United States v. Winstead, 890 F.3d 1082, 1092(III) n.14 (D.C. Cir. 2018), Campbell noted, in the case of ambiguity, "'the rule of lenity … has some force.'" 22 F.4th at 446(III).

only way that "loss" in §2B1.1(b)(1) means what the court in this case concluded it means is by modifying that otherwise plain term with the word, "intended." See Banks at 258(II)(B). The only reason an ambiguity exists is *because of* the language in the Commentary, but "[t]he language in the Commentary cannot, by its own force, create an ambiguity" in the Guideline. Campbell at 445(III) n.4.

### 2. *The court's finding of intent to launder all of the funds received has no support in the record*

Finding $1.75 million of intended loss also requires a judge-found fact as to Izzat's intent. After considerable back-and-forth about when in the course of events a crime had actually taken place, the court challenged Izzat's attorney: "you're saying that at no time unless money was actually spent by the defendant it never can be viewed as a crime because he spends it? Just because he's gotten it through fraudulent means, you're saying it doesn't become a crime until he starts to spend it." [S:17][JA2262]. The answer is that, yes, a crime has been committed in the first scenario, but the crime is fraud (wire or bank), for which Izzat was acquitted, not money laundering, for which Izzat was convicted. The court's loss calculation was attributable to the intended loss of the acquitted fraud, not the actual loss of the convicted money laundering: "I don't think because we're dealing with relevant conduct I should be

43

talking in terms of preponderance of the evidence, not in terms of beyond a reasonable doubt." [S:17][JA2262]. See McClinton, supra.

Counsel for Izzat argued, "beyond [intended loss] the Court has to engage in speculation to assume that he intended to take that full 1.[7]5 million." [S:16][JA2261]. The burden to prove such intent is, "on the Government to at that point show that the money was intended to be spent." [S:18-19][JA2263-2264]. Weighing against such speculation was Izzat's meeting with BOA "three, four times" before the matter was referred to their fraud department. [T6:76-77][JA1590-1591]. The loan money was received into the accounts on May 5, 6 and 14, 2020. [T3:106;193;202] [JA1620;JA1707;JA1716]. The accounts were not frozen until about eight weeks later. [T2:162-63][JA99-100]. This does not demonstrate intent to launder all of the funds.

Since the jury convicted Izzat for "engaging in monetary transactions … in criminally derived property of a value greater than $10,000," the crime is not complete until the defendant engages in a monetary transaction, "in criminally derived property of a value greater than $10,000." [Doc. 34 at ¶¶61-64][JA44-45]. See generally United States v. Cabrales, 524 U.S. 1, 9(II)(1998)(noting that §1957 money laundering was completed when defendant allegedly "deposited and withdrew" funds). By

44

definition and by the terms of the indictment, prior to the transactions, Izzat had not laundered money and there was no loss resulting from any crime *for which he was convicted*.[34] There can be no loss before the offense is committed.

The court seemed to acknowledge the conundrum when it said, "[t]he fact that the defendants didn't downstream spend the money is its own problem from a money laundering perspective, but it shouldn't inform whether or not there was a loss," but this conclusion confuses the forest for the trees. [S:20][JA2265]. The court's broad interpretation of what constitutes money laundering and unsupported conclusion that Izzat intended to launder $1.75 million was an abuse of discretion as to the loss amount.

### C. *The Court Erred In Enhancing Izzat's Sentence Based On Gross Receipts*

U.S.S.G. §2B1.1(b)(17)(A) instructs sentencing courts to apply a two-level increase, "[i]f – the defendant derived more than $1,000,000 in gross receipts from one or more financial

---

[34] Izzat notes the repeated arguments of the government and observations of the court with respect to his alleged participation in Tarik's bank and wire fraud, for which he was acquitted, as when the court stated, "I just disagree that you say that it never can be factored into a sentencing until he actually spends some of the money *even though he's defrauded a bank*. If he sits on $100,000 *that he defrauded from a bank*, there's no loss – calculable loss for sentencing purposes until he starts spending that money." (emphasis added)[S:19][JA2264].

institutions as a result of the offense." Application Note 13(B) defines, "[g]ross receipts from the offense" as, "all property, real or personal, tangible or intangible, which is obtained directly or indirectly as a result of such offense." Cf. 18 U.S.C. §982(a)(4).

The problem is that "the offense" of conviction for Izzat was money laundering, *not wire or bank fraud*. [S:24][JA2269]. The court disagreed with Izzat's interpretation of the Guideline: "I think your reference to offense there is what is the underlying crime. We still get back to what's important here is relevant conduct. And so I don't think offense there excludes relevant conduct. I think the term of offense includes the underlying crime and relevant conduct." [S:26][JA2271].

In United States v. Sandlin, 589 F.3d 749, 757(II)(B)(4)(5th Cir. 2009), the appellant had been convicted of "making false statements on two loan applications in violation of 18 U.S.C. §1014." The Fifth Circuit addressed the novel question of what, "as a result of" in then-U.S.S.G. §2B1.1(b)(14)(A) means. Sandlin, 589 F.3d at 757(II)(B)(4). Although it does not address precisely the same issue, the holding is persuasive, as where the Court held that the Guideline's, "simple language requires that the money be derived

as a result of the violation of the statute" of conviction, focusing its analysis "on the actions of the bank," i.e. did the Appellant acquire the money because of false statements? <u>Sandlin</u> at 757(II)(B)(4). Translating that holding to this case should persuade the Court that the "simple language" required the court to consider whether Izzat derived "more than $1,000,000 in gross receipts" from laundering the proceeds of Tarik's fraud. U.S.S.G. §2B1.1(b)(17)(A).

Izzat did not obtain more than $1,000,000 in gross receipts from the money laundering activity alleged in this case. The government failed to prove that U.S.S.G. §2B1.1(b)(17)(A) applies and the court erred in holding otherwise.

------- ◊ -------

## CONCLUSION

**WHEREFORE**, Izzat requests that this Honorable Court **reverse** the jury's verdict, **vacate** his sentences and **provide** any further relief required by the ends of justice.

------- ◊ -------

## STATEMENT REGARDING ORAL ARGUMENT

Izzat requests oral argument on this matter. The issues raised in this appeal, particularly the government's use of former counsel to testify against the defendants and the court's

47

limitation on Izzat's opportunity to cross-examine Tarik's former counsel, are matters of great public concern.

This 29th day of August, 2023.

Respectfully Submitted,

**/s/ Mark Yurachek**
Mark Yurachek
Va. Bar No. 66093

**/s/ W. Rob Heroy**
W. Rob Heroy
N.C. Bar No. 35339

*Counsel for Appellant*
*Izzat Freitekh*

------- ◊ -------

## CERTIFICATE OF COMPLIANCE

1.  This document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

    this document contains <u>10,114</u> words.

2.  This document complies with the typeface requirements because:

    This document has been prepared in a proportional spaced typeface using <u>Microsoft Word</u> in <u>12-point Courier New</u>.

This 29th day of August, 2023.

Respectfully Submitted,

*/s/ Mark Yurachek*
Mark Yurachek
Va. Bar No. 66093

*/s/ W. Rob Heroy*
W. Rob Heroy
N.C. Bar No. 35339

*Counsel for Appellant*
    *Izzat Freitekh*